IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DEREK M. CASTLEBERRY, )
)
Plaintiff, )
)
v. ) CIVIL ACTION NO. 2:13cv411-CSC
) (WO)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
Defendant. )

**MEMORANDUM OPINION and ORDER**

**I. Introduction**

The plaintiff, Derek M. Castleberry ("Castleberry"), applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., alleging that he was unable to work because of a disability. His application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded to the Commissioner for further proceedings.

## II. Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Substantial evidence is "more than a scintilla," but less than a preponderance: it "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004) (quotation marks omitted). The court "may not decide the facts anew, reweigh the evidence, or substitute . . . [its] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004) (alteration in original) (quotation marks omitted).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## III. The Issues

**A. Introduction.** Castleberry was 31 years old at the time of the hearing before the ALJ. (R. 54). He completed twelfth grade and received a high school certificate of

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

attendance.[4] (R. 54-55). Following the hearing, the ALJ concluded that Castleberry has severe impairments of "status post head injury with nystagmus, headaches, and degenerative disc disease." (R. 38). The ALJ concluded that the plaintiff was unable to perform his past relevant work as an awning installer and construction worker, but, using the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2, as a framework and relying on the testimony of a vocational expert, he also concluded that there were significant number of jobs in the national economy that the plaintiff could perform. (R. 42-43). Thus, the ALJ concluded that the plaintiff was not disabled. (R. 43).

**B. Plaintiff's Claims.** Castleberry presents three issues for the Court's review. As stated by Castleberry, they are as follows:

1. The ALJ's finding that Plaintiff can perform a limited range of light work is not supported by substantial evidence.

2. The ALJ improperly discredited the subjective testimony of Plaintiff with respect to his non-exertional limitations.

3. The ALJ failed to adequately develop the record.

(Doc. # 12, Pl's Br. at 5).

## IV. Discussion

The plaintiff raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal

[4] Castleberry testified that he did not receive a high school diploma because he failed his exit examination. (R. 56).

standards and substantial evidence.[5] *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the ALJ erred as a matter of law, and, thus, this case is due to be remanded for further proceedings.

While a claimant has the burden of proving that he is disabled, an ALJ has a basic duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *Kelley v. Heckler,* 761 F.2d 1538 (11th Cir. 1985). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking. It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id*. The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner." 20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

---

[5] The Commissioner's regulations also require that a written decision contain several specific elements.

> *Any* such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual *shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based*.

42 U.S.C. § 405(b)(1) (emphasis added).

An ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992). When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion or record over another. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981).[6] "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson v. Heckler,* 755 F.2d 781, 785 (11th Cir. 1985). As will be explained, the court concludes that the ALJ failed to fully and fairly develop the record concerning the effect of the plaintiff's dizziness, loss of balance and headaches on his ability to perform work.

The medical evidence demonstrates that Castleberry fell from a scaffolding truck, and suffered traumatic injuries to his head, neck and spine. (R. 239). He was discharged from Louisiana State University Health Sciences Center on January 29, 2010 after being diagnosed with

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

1. Right temporal intraparenchymal contusion.
2. C7 and T1 transverse fracture on the left.
3. Rib fractures 3 through 9 on the left.
4. Temporal bone fracture, petrous portion on the right.
5. Nasal bone fracture.
6. Left parietotemporal skull fracture through the left orbital wall.

(*Id*.).

He was also referred to an orthopaedic clinic, a trauma clinic, an ENT specialist and a neurologist for follow-up appointments. (R. 240).

On February 1, 2010, Castleberry presented to the emergency room of the Shelby Baptist Medical Center in Alabaster, Alabama complaining of headaches, dizziness, weakness, and neck and back pain. (R. 259, 325). A CT scan of his brain revealed a hematoma and multiple fractures. (R. 288, 292).

Castleberry was seen on February 9, 2010 at Orthopaedic Specialists of Alabama, PC. (R. 302, 312). Castleberry reported at that time that while his headaches were gone, "he gets a little bit of dizziness if he looks up quickly." (*Id*.) Castleberry was released to return to work "from ortho standpoint" on March 3, 2010. (R. 309).

Castleberry first presented to Dr. Marc Routman, an ENT specialist, on February 10, 2010. (R. 328). At that time, Castleberry reported dizziness when his head was back and he was looking up. (*Id*.) On February 15, 2010, Dr. Routman documented his examination of Castleberry for worker's compensation. (R. 332-33). Dr. Routman noted that Castleberry had suffered a conjunctival hemorrhage and multiple fractures. (*Id*.) Dr. Routman noted that Castleberry suffers from dizziness when turning his head to look up. (*Id*.) Dr. Routman

diagnosed Castleberry with "traumatic vertigo with up gaze." (R. 333).

In March 2010, Castleberry attempted to return to work but he was unable to sustain employment due to headaches and dizziness. (R. 59, 335, 359).

Castleberry returned to Dr. Routman on March 10, 2010 and reported continued dizziness when he "moves too fast, bends over, [or] looks up." (R. 334). Dr. Routman diagnosed Castleberry with post-concussive dizziness and did not release him for work until "cleared by neurology." (*Id.*) On April 1, 2010, Castleberry presented to Dr. Routman complaining of dizziness and loss of balance whenever he looked up. (R. 335). Dr. Routman again diagnosed vertigo. (*Id.*) He also declined to release Castleberry for any work "until further notice." (R. 336).

On April 5, 2010, a VNG[7] test did not demonstrate any "spontaneous nystagmus . . . during gaze or positional tests." (R. 338). Nonetheless, Dr. Routman indicated that Castleberry was suffering from "post-concussive syndrome (not inner ear)," recommended a follow-up to a neurologist and again directed "[n]o work for now." (R. 337, 345).

Castleberry was referred to Dr. Gordon Kirschberg, a neurologist, for further testing, evaluation and treatment. (R. 359-61). On April 27, 2010, Castleberry reported to Dr. Kirschberg that he was suffering from severe headaches "and more worrisome than the headache was a feeling that when he moved his neck up or down to try and look at something he would get extremely lightheaded but not vertiginous and he would also feel

[7] VNG stands for videonystagmography which tests inner ear functions.

severe pressure in the right posterior aspect of the head." (R. 359). A CT scan indicated "resolution of the hematoma but he continues to have chronic daily headaches, . . . the dizziness and increased headache on looking up or down and worse in bright lights, ..." (*Id*.) Dr. Kirschberg's evaluation demonstrated "a little left lateral nystagmus, worse with looking up but the patient does not experience vertigo. There is perhaps minor right lateral nystagmus." (R. 360). Dr. Kirschberg concluded that Castleberry was suffering from more than post concussive syndrome.

> It is a post head injury syndrome or post traumatic syndrome, whichever term you would prefer. The dizziness does seem to be accompanied by nystagmus when he moves his head so even though it is not positional vertigo it is certainly positional nystagmus.

(*Id*.). Dr. Kirschberg recommended a complete neurological work up, (*id.*), and he prescribed Anaprox. (R. 361).

Castleberry presented to Dr. Kirschberg on June 2, 2010, indicating that he was feeling "30% better after only a couple of weeks of physical therapy." (R. 353). However, he continued to experience dizziness. (*Id*.)

On June 29, 2010, Dr. Kirschberg indicated that none of the treatments including reconditioning therapy, aspirin, Ketoprofen or Antivert had helped Castleberry. (R. 351). Dr. Kirschberg prescribed Klonopin for dizziness as well as an epidural block. (*Id*).

On July 19, 2010, Castleberry complained to Dr. Kirschberg that "every time he looks up he gets dizzy." (R. 350). Dr. Kirschberg noted that Castleberry was "no better. Nothing has worked." (R. 350). Dr. Kirschberg released him to work with "avoidance of neck

extension and looking up and avoidance of being off the ground." (*Id*.)

On September 22, 2010, Castleberry returned to Dr. Routman complaining of dizziness and loss of balance. (R. 390). During therapy, he fell to the side if he looked away from the table. (*Id*.)

A subsequent VNG test on October 4, 2010 was positive. (R. 392)

> On all of the tests the patient displayed nystagmus during the process of moving to a supine position. This mitigated while remaining supine, but upon returning to the sitting position the patient had nystagmus again. This was stronger on each test returning to a sitting position, but it was even stronger with his head turned to the right. However, on the repeat dix-hallpike test with head turned left the patient had a different kind of nystagmus. He displayed rotational nystagmus upon returning to the sitting position. This concludes that the patient had nystagmus on each test all while in motion, moving from sitting to lying or lying to sitting.

(*Id*.)

On October 11, 2010, Dr. Routman reviewed Castleberry's VNG test noting that he "[b]asically gets dizzy/nystagmus with every head movement, not just with head right or left." (R. 395). Dr. Routman diagnosed Castleberry with central vertigo, post-concussion. (*Id*.) Dr. Routman also wrote to Dr. Kirschberg to describe his findings.

> We performed a Dix-Hallpike test with recording. This was to confirm your opinion of a benign positional vertigo. The physical therapy that was ordered as well as the Epley maneuver were unsuccessful in relieving his dizziness, and hence he is back in my office for further evaluation. The Dix-Hallpike performed in my office showed that he got dizzy with nystagmus with almost every head movement made. This didn't matter if it was head down, head right, head left, or sitting back up. All of these motions caused dizziness with nystagmus. With the head back and left, he had a rotational nystagmus with would not be certainly consistent with benign positional vertigo.

> Therefore, it is my opinion that this continued dizziness with head motion is not a benign condition but more likely to be a post-concussive type situation. I have again put him on home vertigo exercises in hopes that he can be retrained. At this point, the physical therapy has not helped his symptoms. We are also trying him on a scopolamine patch of the mastoid skin to see if this helps.

(R. 396).

On February 1, 2011, Castleberry underwent a functional capacity evaluation by Chris Lynch, a registered, licensed occupational therapist. (R. 399-403). Lynch opined as follows.

> Most activities limited by Mr. Castleberry were limited secondary to c/o headaches and dizziness. These activities were limited anytime Mr. Castleberry had a change in head position (looking up, down or right, left). Limitations to occasional basis: ladder climbing, crawling, bending and overhead reach. Work at unprotected heights should be avoided all together. *It is important to note that several times during the FCE a change in head position Mr. Castleberry lost balance, self corrected without falling* yet c/o severe headache; however he reports driving himself from Clanton, Alabama an 1 ½ hour drive which also requires changes in head position. It appears driving should also cause difficulty.

(R. 402) (emphasis added).

Despite Lynch's observation that Castleberry lost his balance several times during the evaluation, Lynch opined that Castleberry "demonstrates the ability to perform work consistently in the HEAVY classification. The following tasks were demonstrated at a frequent basis: sitting, standing, walking, kneeling, sustained kneeling, squatting and stair climbing." (*Id.*)

During the administrative hearing, Castleberry testified that his headaches and

dizziness were "real bad when [he] looked straight up in the air." (R. 61). He also testified that he gets dizzy when he looks up, but he loses his balance when he looks down. (R. 66). Castleberry testified that although he baths his children, they get in and out of the tub by themselves. (R. 64). He further testified that he has difficulty walking.

> A The only trouble I have is, like, when I'm walking from, like, the living room to the kitchen or something. If I'm not looking down at my feet, or you know, if I'm not looking at the floor. If I pick my head up and look left and right I kind of stumble left and right a little bit. And then if I get in a hurry and I kind of, try to go from the refrigerator to the kitchen or to the sink real fast, when I turn I kind of stumble a little bit. But I don't fall over nothing. I just stumble, you know, and then I have to catch my balance. And then I get back right. But it's just –
>
> * * *
>
> A Well all right; well let's talk about the dizziness. What brings on – what activities that you perform brings on dizziness? You already talked about walking from the refrigerator somewhere –
>
> A Yeah, but that's just unbalanceness, the – I feel like I'm going to fall over. The dizziness is when I look up in the air, or I lay down, the room kind of feels like I'm floating. I feel like I'm on a boat. And then the dizziness, when I look straight up in the air, I got to grab a hold of something or I am going to hit the ground. So –
>
> Q All right.
>
> A Looking up I cannot do.
>
> Q Turning – looking up does that cause you dizziness?
>
> A Yes, sir.
>
> Q What about looking down?
>
> A Not as bad, but I don't get no dizziness. I just get unbalanced feeling.

I feel like I'm going to tip over.

Q So you get unbalanced looking down, but you get dizzy looking up?

A Yeah, I get dizzy.

Q What about looking – turning your head sideways back and forth?

A I just get that uncomfortable, like if I'm standing up it's an unbalanced feeling. If I'm sitting down it's just a weird kind of woozy feeling in my head, just – I don't know, sick, just woozy.

Q All right, do you have this, do you go through this every day?

A Yes, sir, and headaches all day long, every day.[8]

(R. 64-66) (footnote added).

After giving great weight to the physical capacity evaluation by Lynch, and discounting the plaintiff's testimony, the ALJ concluded that Castleberry had "the residual functional capacity to perform less than the full range of light work" with the following limitations.

> The Claimant cannot climb ladders, ropes, or scaffolds. The Claimant can occasionally climb ramps and stairs, balance, kneel, crouch, crawl, and stoop. The Claimant can occasionally move his head to look at the ceiling and floor. The Claimant should avoid concentrated exposure to extreme temperatures, vibration, humidity, and wetness. The Claimant should avoid all exposure to hazardous machinery, unprotected heights, and large bodies of water. The Claimant should not operate a motor vehicle. The Claimant should not walk on uneven terrain. The Claimant is limited to understanding, remembering, and executing simple instructions and tasks. The Claimant can have occasional and casual contact with the general public and coworkers and accept constructive non-confrontational supervisor criticism. The Claimant can tolerate changes to the work setting if they are introduced gradually.

---

[8] Castleberry testified that he suffers from constant, daily headaches. (R. 67-68).

(R. 39).

The ALJ declined to credit Lynch's assessment that Castleberry could perform heavy work because the ALJ had a "concern that the Claimant could injure himself if he lost his balance while lifting a heavy object." (R. 41). In discounting the severity of the plaintiff's dizziness, this is what the ALJ said:

> The Claimant's activities undermine the credibility of his allegations. The Claimant has demonstrated he can drive for ninety minutes or more. This activity seems inconsistent with a person who claims they have difficulty changing the position of his head. It is obvious that driving requires the driver to make various movements of the head to check cross traffic, cars in side mirrors, cars in the rear view mirror, and any modifications to the air conditioner or radio. The Claimant's ability to drive for that period of time also tends to show the Claimant can concentrate for prolonged periods. The Claimant also stated that he went hunting and has killed several deer. Typically, deer hunters have their head on a swivel looking for their target. There is also a question as to how Claimant picked up his kill. The Claimant also reported that he rides horses. That activity seems inconceivable because each movement by the horse would cause the Claimant to change the position of his head and cause pressure in the spine. The Claimant also rides a riding lawn mower, cooks, vacuums, washes dishes, and playing (sic) with his children. All of these activities are dynamic in nature and undermine his allegation that he has difficulty changing the position of his head.

(R. at 41).

The problem with the ALJ's determination is that his findings regarding Castleberry's ability to perform work are ambiguous, particularly in light of Dr. Routman's medical records coupled with Castleberry's testimony regarding his dizziness and headaches. It is apparent that the ALJ discounted Castleberry's testimony based on comments he allegedly made to Lynch regarding driving and hunting. (R. 41). However, the ALJ failed to make any inquiry

at all to Castleberry about how his dizziness or loss of balance affects his ability to drive and/or hunt. But more to the point, the medical evidence shows without contradiction that Castleberry has dizziness when his head changes position. The fact that he will undertake activities does not mean he does not get dizzy and what is not clear from the record before the court is the extent to which that condition will impact him in a work setting. In other words, what is not clear is whether Castleberry's choice to drive and hunt is the result of his physical ability or the result of him disregarding his own safety and the safety of others. Consequently, the court concludes that there exists a conflict or ambiguity in the evidence regarding the effects of Castleberry's dizziness on his ability to perform work activities. *See Barrio v. Comm'r of Soc. Sec. Admin.*, 394 Fed. Appx. 635, 637 (11th Cir. 2010) (remand is warranted when ALJ's RFC determination is ambiguous). When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion regarding the plaintiff's capacity for work over another. This he failed to do.

After setting forth his residual functional capacity conclusion, the ALJ launches into a description of the medical evidence of record. (R. at 39-42). During his recitation of the medical evidence, the ALJ acknowledged that Castleberry suffers from dizziness, headaches and nystagmus.

> The Claimant has been treated for the dizziness associated with his injury. In April 2010, a VNG indicated the Claimant did not have any nystagmus (Ex. 10F). However, A VNG in October 2010 showed the Claimant had nystagmus when he changed the position of his head (Id.). The Claimant has

> been treated with Antivert, Aspirin, vestibular rehabilitation, physical therapy, and Klonopin; however, the treatment has not been effective (Exs. 8F and 10F). The records indicate the Claimant has not had any treatment since October 2000 (Ex. 10F).

(R. 40).

However, this is the extent of the ALJ's discussion of Castleberry's medical records detailing his dizziness, loss of balance and headaches. He does not discuss the implications of Castleberry's continued dizziness. "[T]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986); *Gray v. Comm'r of Soc. Sec.*, 426 Fed. Appx. 751, 753 (11th Cir. 2011); *Manzo v. Comm'r of Soc. Sec.*, 408 Fed. Appx. 265, 269 (11th Cir. 2011).

In this case, the ALJ's failed to "discuss meaningfully how [Castleberry's dizziness, loss of balance and headaches] might affect [his] ability to perform" work. *See Barrio*, 394 Fed. Appx. at 638. While it is undisputed that Castleberry suffers from dizziness, loss of balance and headaches, what is not clear is how these conditions *affect* Castleberry's ability to work. "[W]hen the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,' we will decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.' " *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting *Owens v. Heckler,* 748 F.2d 1511, 1516 (11th Cir.1984) (per curiam)). Given that the ALJ failed to clarify these ambiguities and address with

particularity the effect of Castleberry's dizziness, loss of balance and headaches on his ability to work, it is impossible for the court to determine whether the ALJ's ultimate conclusion that Castleberry is not disabled[9] is supported by

[9] The court notes that during the questioning of the vocational expert, there was some confusion regarding the effects of Castleberry's dizziness on his ability to work.

> Q All right, now as a second hypothetical I'd like to add the following limitation to the first hypothetical. This individual should do no more than on an occasional basis be required to have any up and down movement of their head. With that limitation added to the first hypothetical could such an individual perform any work in the national or regional economy?
>
> A That's an interesting question. I think I know the answer but I want to clarify it.
>
> Q Okay.
>
> A He can't move his head up and down. Can he move his torso up and down with his – the result being that his head would in fact move up and down? I mean this is a neck thing, or just the whole head including the upper torso?
>
> Q Well I guess – let me ask some questions, I guess follow up on that.
>
> Q Mr. Castleberry, when you have this kind of disoriented feeling when you are looking up and down, is it from just moving your head of – let's say you do not bend your neck, but you just bend at the waist and look down, do you also have the disoriented feeling, or –
>
> A I don't have the disoriented feeling, but I feel like I'm going to tip over with it.
>
> Q Okay.
>
> A You know, like if I bend over, if I'm just standing there and I bend over to pick up something I have to put my other hand down so I don't flop over on my face.
>
> * * *
>
> A I kind of tip over that way. Anything'll make me top over. On them therapy things they was having me try to walk on little two by fours and stuff, and I been walking two by fours since I been out of high school framing houses, and I ain't never couldn't walk a two by four. And I couldn't even walk a two by four. She had me stand still one time and close my eyes and just look straight ahead, and close my eyes, and I fell over, and it took two of them to hold me up.

substantial evidence in the record. Thus, this case must be remanded.

## CONCLUSION

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion. It is further

---

Q Okay.

A Just from closing my eyes.

(R. 73-75).

The vocational expert then testified that Castleberry could perform work including products assembler, electronics worker and mail clerk. (R. 76). Castleberry's attorney then asked the vocational expert some follow-up questions.

Q I'm not sure I understood maybe the hypothetical exactly, the parameters of it, but you're not saying, doctor, that a mail clerk is not required to bend over? I mean they drop a piece of mail on the floor or they have to pick up a package – even a mail clerk has to look down on the floor from time to time, would you not agree with that?

A Yeah. The hypothetical – the second hypothetical said, as I understood it, that he could occasionally look up or down, and up or down being the ceiling and the floor. And so in my processing of that question I thought okay, this – everything kind of in a normal work space would be acceptable.

Q Okay, and occasionally of course is defined by Social Security as anywhere from 1 percent to 33 percent and a third of an eight hour day.

A Exactly.

Q But you agree that based on the claimant's testimony if the court deems it credible, that if he has the limitations that looking down even once or twice during the day causes him to be dizzy and fall that would preclude that type of work?

A I think it would.

(R. 78-79).

It is unclear from the colloquy whether Castleberry would be precluded from all work or just from work as a mail clerk.

ORDERED that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 fn. 2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after he receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 Fed. Appx. 241, 242 fn.1 (11th Cir. 2008). A separate final judgment will be entered.

Done this 30th day of May, 2014.

/s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE